**FOR PUBLICATION**                                                    **CLOSED**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

|  |  |
|---|---|
| CLEMENT BATTONI, JR., et al., | : |
| | : |
| Plaintiffs, | :  Civil Case No. 05-934 (FSH) |
| | : |
| | : |
| v. | :  **OPINION** |
| | : |
| IBEW LOCAL UNION NO 102 EMPLOYEE | :  Date: August 8, 2008 |
| PENSION PLAN, IBEW LOCAL UNION NO. 102 | : |
| EMPLOYEE WELFARE FUND, et al., | : |
| | : |
| Defendants. | : |

---

**HOCHBERG, District Judge**.

I.      **INTRODUCTION**

        This case arises after the merger of two local chapters of the International Brotherhood of

Electrical Workers' Union (Local 102 and Local 675).  At the time of the merger, the pension plans

and welfare plans of the two locals were also merged into a pension plan and a welfare plan for the

new merged chapter (Local 102 became the "surviving" chapter).  The Local 675 pension plan

permitted participants to opt to take retirement benefits as either a lump sum or a monthly pension.

The right to take benefits as a lump sum was a vested right that had "accrued" for purposes of

ERISA's anti-cutback rule.

        After the merger, the newly-merged welfare plan adopted an amendment (the "Disputed

Amendment") to the welfare plan that eliminated welfare plan benefits for any participant of the

welfare plan who had made an election to receive a lump sum benefit from the pension plan.  The

instant litigation is a challenge to this amendment on the grounds that it constitutes a pension plan cut-back, in violation of ERISA's anti-cutback provision. Plaintiffs are certain union members who have vested rights to elect a lump sum benefit; Defendants are the trustees and pension and welfare plans of the merged union chapter. Defendants argue that the Disputed Amendment constitutes a change to the welfare plan–not to the pension plan–and because welfare plan benefits are not vested nor subject to the restrictions of the anti-cutback provision of ERISA, the disputed amendment is not a cutback to the pension plan.

This Court held a bench trial on December 3, 2007 and January 29, 2008. The Court makes the following findings of fact and conclusions of law.

## II.     FINDINGS OF FACT[1]

### A.     Stipulated Facts[2]

J1. Plaintiffs are current or retired members of International Brotherhood of Electrical Workers' Local Union 102 ("LOCAL 102"). Plaintiffs Charles F. Waller (DOR 1/1/06) and Raymond Guiliano (DOR 9/1/06) are now retired members.

J2. Plaintiffs were formerly members of International Brotherhood of Electrical Workers' Local Union 675 ("LOCAL 675") and (for some or all), before that, of International Brotherhood of Electrical Workers' Local Union 262 ("LOCAL 262").

J3. LOCAL 675 was merged into LOCAL 102 pursuant to an Order of the International Union of Electrical Workers, the parent organization, located in Washington, D.C.

_____

[1] Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law.

[2] These facts were stipulated to by the parties in the Final Pretrial Memorandum. The Court adopts these facts as findings of fact.

J4.  The merger of LOCAL 675 into LOCAL 102 took place in November of 1999 with LOCAL 102 becoming the successor organization.

J5.  At approximately the same time that LOCAL 675 was merged into LOCAL 102, the IBEW Local 675 Pension Plan ("675 PENSION PLAN") was merged into the IBEW Local 102 Pension Plan ("102 PENSION PLAN") with the 102 PENSION PLAN becoming the successor Plan.

J6.  Prior to the merger of the 675 PENSION PLAN into the 102 PENSION PLAN, Plaintiffs were participants in the 675 PENSION PLAN.

J7.  After the merger of the 675 PENSION PLAN into the 102 PENSION PLAN, Plaintiffs became participants in the 102 PENSION PLAN.

J8.  The individual defendants are current Trustees of the 102 WELFARE PLAN (as shown in an attachment to Defendants' Answers to Interrogatories) and the 102 PENSION PLAN (*see* above); and the Trustees of the plans in 1999 and 2000.

J9.    At the time the 102 PENSION PLAN and 675 PENSION PLAN were merged, the 675 PENSION PLAN was under funded by 22%, *i.e.*, it had enough financial assets sufficient to pay only 78% of its accrued pension liabilities to participants including the Plaintiffs, whereas the 102 PENSION PLAN was 105% funded and had enough financial assets sufficient to pay all of its accrued pension liabilities to all 102 PENSION PLAN participants.

J10. Both the 675 PENSION PLAN and the 102 PENSION PLAN were defined benefit type of pension plans at the time of the merger.

J11. The 675 PENSION PLAN permitted, and the 102 PENSION PLAN currently permits, for Plaintiffs and other former LOCAL 675 members, a retiring member to select either periodic monthly pension benefits or a lump sum benefit or a combination of both.

3

J12. Prior to the date of the merger, November 1999, the 102 PENSION PLAN did not contain any provision for lump sum pension benefits. The plan only permitted periodic monthly pension benefits, except for a death benefit.

J13. Prior to the date of merger, November 1999, the 675 PENSION PLAN permitted a lump sum option for all years of service, whereas, after November 1999 the 102 PENSION PLAN only allows for a lump sum for service earned up to November of 1999 (date of merger) and a periodic monthly benefit for service earned after November 1999 for Plaintiffs and other former LOCAL 675 members.

J14. The 102 PENSION PLAN does not permit any lump sum payment for service earned after November 1999, the date of the merger.

J15. Plaintiffs, in addition to being participants in the 675 PENSION PLAN and the 102 PENSION PLAN, at the appropriate times as stated above, also have been participants in the IBEW Local 675 Welfare Plan ("675 WELFARE PLAN") and the IBEW Local 102 Welfare Plan ("102 WELFARE PLAN"), which have provided hospital and medical surgical benefits to all eligible members pursuant to the eligibility rules set forth in the relevant Summary Plan Description.

J16. At approximately the same time that LOCAL 675 was merged into LOCAL 102, the 675 WELFARE PLAN was merged with the 102 WELFARE PLAN, with the 102 WELFARE PLAN becoming the successor Plan.

J17. The 102 WELFARE PLAN provides hospital and medical surgical benefits to all eligible members pursuant to the eligibility rules set forth in the 102 WELFARE PLAN Summary Plan Description.

4

J18. There are currently approximately 4,200 participants in the 102 WELFARE PLAN, some of whom are either active members, disabled members, COBRA members or retired members who have qualified pursuant to written eligibility rules.

J19. The 102 WELFARE PLAN and the 102 PENSION PLAN are separate legal entities, and each have their own EIN, separate federal reporting requirements, separate audits, separate bank accounts and separate investments.

J20. The 102 WELFARE PLAN and the 102 PENSION PLAN each have their own IRS favorable determination letter granting a tax exemption, file their own Department of Labor Form 5500, have their own investment policy and issue their own Summary Plan Description.

J21. <u>omitted</u>

J22. The 102 WELFARE PLAN has a separate Board of Trustees from the 102 PENSION PLAN, but they have some of the same administrators and offices, have the same legal counsel and currently share the same trustees. From time to time they have joint meetings.

J23. The 102 PENSION PLAN is funded as part of the same Collective Bargaining Agreement negotiation as the 102 WELFARE PLAN. Assets of either plan may not be commingled with the other.

J24. All contributions to the 102 PENSION PLAN and the 102 WELFARE PLAN are made by employers who are signatory to a written Collective Bargaining Agreement with LOCAL 102, which Agreement is subject to approval by its members. Contributions are subject to approval by members of LOCAL 102 after they are presented with information as to the needs of each benefit fund.

J25. The Summary Plan Description ("SPD") for the 102 WELFARE PLAN states:

5

"PLAN CHANGE OR TERMINATION

"The Trustees reserve the right to discontinue (a) the types and amount of benefits under the Plan and (b) the eligibility rules for extended or accumulated eligibility, even if extended eligibility has already been accumulated.

Plan benefits and eligibility rules for active, retired or disabled Participants:

1.    are not guaranteed;
2.    may be changed or discontinued by the Board of Trustees;
3.    are subject to the rules and regulations adopted by the Board of Trustees;
4.    are subject to the Trust Agreement which establishes and govern Fund's operations; and
5.    are subject to the provisions of the group insurance policies purchased by the Trustees.

"The nature and amount of Plan benefits are always subject to the actual terms of the Plan as it exists at the time the claim occurs.

"If the Plan is changed or discontinued, it will not affect you or your beneficiaries' right to any covered benefit to which you already have become entitled."

The terms of this provision were applicable in prior Summary Plan Descriptions, including those effective at the time of the merger.

J26.  The Trustees of the 102 WELFARE PLAN are "fiduciaries" as that term is defined under the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq., and are responsible for the administration of the 102 WELFARE PLAN.

J27. At the time of the merger of LOCAL 102 and LOCAL 675, the 102 WELFARE PLAN contained a provision which dealt with the eligibility of retired employees and provided as follows:

"As a retired employee, bargaining and non-bargaining, you and your dependent spouse will be eligible for coverage as a retired employee and dependent provided all of the following requirements are satisfied:

6

"You have been eligible as an active employee for at least 32 calendar quarters during the 40 calendar quarters immediately preceding your date of retirement and have attained the age of 62 or of 60 if you are totally disabled.

"You have been eligible as an active employee for at least 52 calendar quarters during the 60-calendar quarters preceding the date of disability and your disability shall have continued for six (6) consecutive months, and you are receiving Federal Social Security Disability Pension Payments or the:

a.    totality and permanence of your disability is established to the satisfaction of the Trustee based upon competent medical evidence presented to them.

b.    you have ceased all work in the electrical construction industry within a participating wage area and you have terminated your status as an eligible, active employee of the Fund.

"For purposes of this section, services under this plan and the New Jersey IBEW Welfare Plan will be combined."

J28. omitted.

J29. After the November 1999 merger of LOCAL 675 into LOCAL 102, the Trustees of the

102 WELFARE PLAN amended the eligibility rules of the 102 WELFARE PLAN, during an April

19, 2000 meeting, effective January 1, 2000, to provide as follows:

"As a retired employee, bargaining and non bargaining, you and your dependent spouse will be eligible for coverage as a retired employee and dependent provided all of the following requirements are satisfied:

"1. You have been eligible as an active employee for at least 32 calendar quarters during the 40 calendar quarters immediately preceding your date of retirement and have attained the age of 62 or of 60 if you are totally disabled, you must be eligible to receive periodic monthly benefit payments from the IBEW Local 102 Pension Plan and/or from another Local Union IBEW Pension Plan except if you have been eligible as a non-bargaining employee or eligible under a 'small works' agreement and are not otherwise eligible for an IBEW Pension. **Retired employees who elect a lump sum pension benefit in lieu of periodic monthly benefits from IBEW Local 102 Pension Plan and/or from another Local Union IBEW Pension Plan shall not be eligible for continued coverage.**
(Emphasis added) (the "Disputed Amendment")

"2. You have attained age 55 and have been eligible as an active employee for at least 52 calendar quarters during the 60 calendar quarters preceding the date of disability and your disability shall have continued for six (6) consecutive months, and you are receiving U.S. Social Security Disability Pension Payments or the:

     a.     totality and permanence of your disability is established to the satisfaction of the Trustee based upon competent medical evidence presented to them.

     b.     You have ceased all work in the electrical construction industry and you have terminated your status as an eligible active employee under the provisions of this Fund.

"For purposes of this section, services under this plan and the New Jersey IBEW Welfare Plan will be combined."

J30.   Under 102 PENSION PLAN before the Disputed Amendment to the WELFARE PLAN, it would be possible for a former LOCAL 675 member to elect to receive a lump sum for all years of service before the merger with the 102 PENSION PLAN and be eligible for continued health benefits for the rest of his or her life with his or her spouse, and then return to active employment after the required waiting period after he or she receives his or her lump sum Pension payment and start accruing eligibility for monthly pension benefits. Prior to the Disputed Amendment, an eligible retired participant would receive health benefits for no additional contribution, whether the member received a lump sum or the monthly pension payment.

J31.   Prior to the merger of the 675 PENSION PLAN with the 102 PENSION PLAN, there was considerable concern among the 675 PENSION PLAN's administrators, attorneys, employers and actuarial consultants regarding the actuarial adverse effect the lump sum option had on the funding status of the 675 PENSION PLAN.

J32.   Predecessors to the Local 675 union and the 675 PENSION PLAN also were concerned with the adverse effect of the lump sum option on the relevant pension plan.

8

J33.  The 102 PENSION PLAN and 102 WELFARE PLAN are funded by contributions from employers pursuant to provisions of a Collective Bargaining Agreement between LOCAL 102 and employers.

J34.  The contributions come from the same employers in amounts negotiated pursuant to the locals' collective bargaining agreements.

J35.  If there is an under funding problem in the 102 PENSION PLAN and the Plan does not meet minimum funding standards, Employers who contribute to the Plan could suffer a potential liability to make up any deficiency.

J36.  Both the 675 PENSION PLAN and earlier pension plans attempted several amendments to limit or restrict in some manner the value of electing a lump sum option, and the lump sum option available under the 675 PENSION PLAN was an issue of concern at the time of the merger into the 102 PENSION PLAN.

J37.  At least one of the efforts was determined a partial violation of 29 U.S.C. § 1054(g). One effort apparently was withdrawn.

J38.  omitted

J39.  Pension credits which members have accrued either under the 675 PENSION PLAN or the 102 PENSION PLAN cannot be reduced on a retroactive basis and are subject to the vesting provisions of each plan dealing with non-forfeitable rights.

J40.  One of the effects of the adoption of the Disputed Amendment has been a reduction in the number of participants who have chosen a lump sum benefit from the 102 PENSION PLAN.

J41.  One of the reasons for the Disputed Amendment was that LOCAL 102 members, trustees and/or participants objected to the ability of those who elected the lump sum option to return

to work without giving back any of their lump sum, while those retirees who received the monthly benefit would stop receiving the monthly benefit if they returned to work.

J42.  <u>omitted</u>

J43.  As a result of the Disputed Amendment it is likely that fewer Union retirees will elect the lump sum distribution rather than lose lifetime retiree health benefits if they would otherwise qualify under the provisions of the 102 WELFARE PLAN.

J44.  Plaintiffs' collective bargaining agreement specifically established the Pension Plan and the Welfare Fund for each relevant union local, and each successive agreement was negotiated to provide for contribution levels for Pension Plan and Welfare Plan benefits.

J45.  The business manager of Local 675 stated in an August 30, 1999 letter to his members, including Plaintiffs, that he had been assured by the actuary and the attorney for the Local 675 plans "that all present benefits (including lump sum payout) by law must be continued for these [pension] funds."

J46.  The Local 675 PENSION PLAN provided that its benefits could not be reduced once accrued.

J47.  Pension credits which members have accrued either under the 675 PENSION PLAN or 102 PENSION PLAN cannot be reduced on a retroactive basis and are subject to the vesting provisions of each plan dealing with non-forfeitable rights.

J48.  A Participant of the LOCAL 102 WELFARE PLAN, including former LOCAL 675 members, who elects to retire under the provisions of the 102 PENSION PLAN and who elects to receive a monthly pension rather than a lump sum payment and who otherwise qualifies based upon

10

service requirements of the 102 WELFARE PLAN will be eligible to receive lifetime health coverage without having to make any further contributions to the 102 WELFARE PLAN.

**B.**     **Additional Findings of Fact**

In addition to the stipulated facts adopted above, the Court finds the following facts after hearing the trial testimony and considering the parties' exhibits.

*1.*     *The Plans Before and After the Merger*

The Defendant, IBEW Local Union 102 Pension Plan is a defined benefit type of Pension Plan and as of January 1, 2000 had a 106% Funded Ratio and had an excess of assets over liabilities for Vested Benefits of $9,025,379.  The IBEW Local Union 675 Pension Plan was a defined benefit type of pension plan and had a 71% Funded Ratio as of January 1, 2000 and had a deficiency of assets over liabilities for Vested Benefits of $20,380,331. (Plaintiffs' Exhibit P-1, pg. 35 of 43. 12/3/07 Tr. at 142:4-8).  Thus, at the time of the merger, the Local 102 Pension Plan was overfunded while the Local 675 Pension Plan was underfunded.

At the time of the merger, the Local 102 Pension Plan only permitted members to receive a monthly pension benefit.  Prior to the merger, the Local 675 Pension Plan permitted members to choose either a lump sum benefit or a monthly benefit.  This lump sum option was incorporated into the Local 675 Pension Plan years earlier when Local 675 merged with Local 262.[3]  The Local 262 Pension Plan included the option to take pension benefits in a lump sum.  At the time of the merger, in an effort to equalize benefits for all members of the newly merged local, Local 675 extended the lump sum option to all members.  After the merger, the Local 102 Pension Plan (i.e., the merged plan) suspended accrual of lump sum benefits for all members.  Former Local 675 Pension Plan

---

[3] All Plaintiffs in this case were members of Local 262 prior to its merger with Local 675 and were all members of Local 675 prior to the merger with Local 102.

11

members with a vested right to elect a lump sum benefit continued to be permitted to elect a lump sum for the benefits accrued prior to the merger, but any additional work after the merger only accrued rights to a monthly benefit.

The International IBEW leadership instructed the two local IBEW chapters to merge.  The International's rules governing the local IBEW chapters does not require the merger of the pre-existing pension plans, though such a merger is generally the custom.  The decision by the Local 102 PENSION PLAN to accept the unfunded liability of the Local 675 Pension Plan, including the vested rights of certain beneficiaries to elect a lump sum distribution, was a decision made at the time of the merger by the Defendants.

According to defendant Pat ("Patsy") Delle Cava, the International Union has a great deal to say about the  merger of local unions, but the International leaves the business of the merger of the pension and welfare plans to the local chapters themselves to work out.  (10-3-07 Tr. at 172:4-25)  If, after a proposed merger there were inequities in the plans to be merged, ordinarily the locals would work them out.

> Well, they work them out.  If one local say was overfunded, and the other one wasn't, like in the case of 675 and 102-- * * * ---what they would do, the trustees get together and they come up with a—plan that's acceptable for everybody.  (10-03-07 Tr. at 173:20-174:6)

Indeed, in this case, when directly asked by the Court whether Local 102 was required to accept any unfunded liability from Local 675, counsel for Defendants stated that there was no such requirement:  "Now, were they required to accept it [the unfunded liability]?  … I think I stated it yesterday, and I'll state it again, were they required to accept that plan?  No."  (10-407 Tr. at 38:3-39:11)

12

2. *Evidence related to reasons for the Disputed Amendment*

Defendants knew that the lump sum option that had been part of the Local 675 Pension Plan was a vested accrued benefit to Plaintiffs and other former Local 675 members and continued to be a vested accrued benefit upon the merger of the two pension plans. As Mr. Delle Cava testified: "it's an accrued right, and there's no way to get rid of it."  (10-3-07 Tr. at 176:11-177:2.)  Defendants were legitimately concerned that the lump sum option had, and could continue to have, negative financial effects on the merged Local 102 Pension Plan. Fifteen retirees had elected the lump sum in 1998 (PX-14 at 28 of 44,[4] Bullet Points; PX-16 at 36 of 44, Bullet Points); as many as 94 Local 675 members had the possibility of electing the lump sum option upon retirement just before the merger (10-4-07 Tr. at 120:23-24); lump sum payments for January 1, 1999 through November 1, 1999, totaled $13,300,127.84 (PX-14 at 26 of 44), and continued exercise of the option would be expensive for the combined pension plan. As Mr. Delle Cava testified: "We were concerned about it." (10-3-07 Tr. at 176:14.) *(See also* 10-4-07 Tr. at 117:21-23 (referring to Pension Plan concern re "mock retirements").)

Defendants also knew that the anti-cutback rule prohibited amendments to the Local 102 Pension Plan intended to restrict the Plaintiffs' exercise of the lump sum option.[5] Local 675 had attempted several amendments concerning its lump sum, and some of these were challenged by litigation (*see, e.g.*, PX-18 & 12-3-07 Tr. at 88:23 – 89:1) or otherwise (e.g., PX-17). Counsel for Defendants in this case, Mr. Scaraggi, was also counsel to the Defendants in that litigation, *Donnelly,*

---

[4] These page references are to the ECF ribbon on the top of the page, where there are no page numbers on the bottom of the original exhibit.

[5] Former Local 675 members who met sufficient seniority requirements had a vested accrued interest in a lump sum benefit for the time they had worked before the merger.  Nothing in this opinion or in ERISA's anti-cutback provisions prevented the newly-merged Local 102 from changing the Pension Plan to prevent any additional accrual of a right to a lump sum election for work after the date of the merger.

*et al. v. Trustees of the IBEW Local Unions Nos. 675 and 102 Pension and Annuity Funds*, Civil
Action No. 00-1008 (WGB) (D.N.J.). Defendants actually participated in Local 675 Pension Fund
meetings to include changes designed to save money. (*See* PX-14 at 3 [26 of 44 at top].)

Plaintiff Clement Battoni complained to Local 102 about the Disputed Amendment to the
Welfare Plan and its restriction on his ability to exercise the lump sum option in the Pension Plan.
Mr. Scaraggi (as the attorney for the Local 102 Pension Plan and the Local 102 Welfare Plan) told
Mr. Battoni in a telephone call: "Patsy [Delle Cava, the administrator of the plan] had to do
something to protect the pension plan." (10-3-07 Tr. at 64:23-24.) Mr. Scaraggi also responded to
the complaint by referring to the unfunded liability of the Local 102 Pension Plan. (*Id.* at 65:4-7.)

When Mr. Battoni complained about the Disputed Amendment in a telephone call with Mr.
Delle Cava, the administrator of both plans, Mr. Delle Cava said that the trustees had to amend the
Welfare Plan to avoid the employers having to pay any underfunded liability in the Pension Plan:

> "He [Delle Cava] said to me, [']well, it's something we had to do,['] [then] I said,
> you know I—I'm not the sharpest tool in the shed, but I'm not dumb as a stump. I
> understand that again the employers are responsible for the under—unfunded
> liability. To which he responded 'and what do you want me to do, have the
> contractors, you know, put the money up and put them out of business?' I said, 'so
> let me—let me understand this. The failure of—the fact that the 675 trustees chose
> to acquiesce to whoever, rather than exercise fiduciary responsibility, I'm supposed
> to pay for that?' To that he replied, 'Well, that's the way it is.'"

(10-3-07 Tr. at 97:14-24) (emphasis supplied.)

Mr. Charles Waller, one of the retired Plaintiffs (*e.g.*, 10-3-07 Tr. at 159:23-24 & 160:14-16)
met with Mr. Delle Cava after the announcement of the merger and the Disputed Amendment. (10-
3-07 Tr. at 157:6-18) He complained that he was being penalized because of the unfunded liability
in the Pension Plan (*id.* at 158:4-12). Mr. Delle Cava said that the employers could not make up the

shortfall to avoid the differential in pension benefits: "But he said what did you want me to do, break

the contractors?  And my comment to him was, well, what did you want to do, break us?"  (10-3-07

Tr. at 158:14-159:18.)

   In his deposition, Mr. Delle Cava gave reasons for the Disputed Amendment to the Welfare

Plan.  He was asked: "Were you concerned about the pension [plan] being depleted by lump sum

payments?" To which he answered, "Oh, sure we were. That's one of the concerns. Yes." (10-3-07

Tr. at 214:18-21.) As to which concern was primary, Mr. Delle Cava stated at his deposition: "<u>Both</u>

[<u>were primary</u>].  <u>There was no [one of the two which was primary]—it was both</u>."  (10-3-07 Tr. at

214:24-215:3) (emphasis supplied.)  At trial, Mr. Delle Cava was asked:

> "Q.  So wouldn't you agree that the drain on the pension plan was at least one of the
> reasons for you being instrumental in achieving a change in the Health and Welfare
> Plan?"
>
> "A.  That was one of the concerns, yes."

 (10-3-07 Tr. at 215:7-10.)  (*See also* Della Cava, 10-4-07 Tr. at 121:14-17) (concerned that lump

sum was a drain on the pension fund).[6]

   Mr. Alan Schell, the Local 102 president, a Defendant and a Trustee stated that there was a

direct connection between the Disputed Amendment (to the Welfare Plan) and the 102 PENSION

PLAN in the decision to amend the Welfare Plan's eligibility rules:

> "THE COURT: What were the eligibility rules that were, amended[;] which
> eligibility rules were amended?

---

[6] The Court noted Defendants' concession and suggested Mr. Scaraggi review it. (10-4-07 Tr. at 44:18 – 45:15.) During the course of cross-examination by Mr. Scaraggi, Mr. Delle Cava was not asked to testify regarding the content of any meeting or conversation he had with Messrs. Battoni, or Waller.  Consequently, their testimony regarding what Mr. Delle Cava said to them stands unchallenged.  See cross-examination testimony of Mr. Delle Cava at 1T222:14-226:10 when Mr. Scaraggi announced he was finished with the witness on cross examination.  Mr. Delle Cava returned to the witness stand as Mr. Scaraggi's direct witness on December 3, 2007.  At that time, he was again not questioned regarding these conversations.

"THE WITNESS: The lump sum benefit payment was amended at that meeting [of the Welfare Plan Trustees]."

(12-03-07 Tr. at 69:12-15.)

The lump sum benefit is, however, only a pension plan benefit. Thus, the actions taken by the Welfare Plan administrators was done to reduce the liability of the Pension Plan. This is clear from the testimony of Mr. Delle Cava, Mr. Schell, Mr. Waller, and Mr. Battoni.

## III.   CONCLUSIONS OF LAW

### A.   ERISA Anti-Cutback Law

ERISA Section 204(g)(1), 29 U.S.C. § 1054(g)(1), provides in relevant part: "The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan …." *See also* 26 U.S.C. § 411(d)(6)(A) (parallel IRS provision); 29 U.S.C. § 1411(b)(2) (prohibiting reduction in accrued benefits as an immediate result of a merger of multiemployer plans). It is undisputed that the lump sum option permitted to Plaintiffs under the Local 102 Pension Plan is an accrued benefit, such that the Disputed Amendment would be prohibited by Section 204(g)(1) if the anti-cutback rule is applicable. It is also undisputed that Plaintiffs' lump sum benefit cannot be curtailed, limited or otherwise restricted by a direct amendment to the Local 102 Pension Plan, and that Plaintiffs would be entitled to notice of any "serious consideration" of such change, *see, e.g.*, 29 U.S.C. § 1054(h). Moreover, if the Local 102 Pension Plan had been amended to provide that, upon retirement, Plaintiffs' lump sum benefit would be forfeited unless Plaintiffs waived their rights to post-retirement benefits under the Local 102 Welfare Plan, that amendment would have

16

constituted a violation of the anti-cutback rule because it would have placed a condition on a previously accrued benefit.

In this case, rather than amending the Local 102 Pension Plan, the Disputed Amendment changes the terms of the Local 102 Welfare Plan.  As shown by the testimony at trial, at least part of the intent and effect of the Disputed Amendment was to accomplish indirectly what could not be accomplished directly without violating the anti-cutback rule. Defendants argue that the Disputed Amendment cannot violate the anti-cutback rule because it is an amendment to a welfare plan, not to a pension plan.  Plaintiffs respond that the Disputed Amendment is a constructive, indirect and/or de facto amendment of the Local 102 Pension Plan prohibited by ERISA.

The anti-cutback rule is a "crucial" aspect of ERISA's protection of pension benefits. See e.g., Central Laborers Pension Fund v. Heinz, 541 U.S. 739, 743-44 (2004); see also Bellas v. Westinghouse Pension Plan, 221 F.3d 517, 522 & 525 (3d Cir. 2000), cert. denied, 531 U.S. 1104 (2001).  In light of the importance of the anti-cutback rule and in order to avoid work-arounds that curtail accrued benefits by means other than formal plan amendments, courts have deemed actions to be violative of the anti-cutback rule even when there had not been a formal amendment of a pension plan. See Gillis v. Hoechst Celanese Corp., 4 F.3d 1137 (3d Cir. 1993) (finding a restriction could be "tantamount" to a prohibited plan amendment), cert. denied, 511 U.S. 1031 & 511 U.S. 1004 (1994).  Treasury regulations implementing the anti-cutback rule make the point explicitly: Section 1.411(d)-4, A-4(a), provides that a pension plan may not deny a protected benefit "directly or indirectly, through the exercise of discretion …." (Emphasis added.)  The Seventh Circuit recently stated that

17

a pension plan violates the anti-cutback rule if it attempts to "disguise [as an 'off-plan' benefit] a penalty exacted against lump sum recipients …." Williams v. Rohm and Haas Pension Plan, 497 F.3d 710, 713 (7th Cir. 2007) (holding that COLA benefit must be included in calculation of lump sum benefit, even though not explicitly part of plan), rehearing denied, 2007 U.S. App. LEXIS 24456 (7th Cir. Oct. 10, 2007).

The parties have cited no cases analogous to the Disputed Amendment to the welfare plan in this case that cuts off welfare benefits whenever a participant elects the lump sum pension plan benefit. Indeed, the parties cite to no cases that relate to the merger of union plans where the pre-existing plans carried substantially different vested benefits and substantially different funding levels.

While Defendants adduced some evidence related to the under-funded liabilities of the former Local 675 Pension Plan, Defendants did not retain an expert, nor any witness with specialized knowledge, to attempt to demonstrate that the Local 675 Pension Plan was so severely underfunded that the vested right to take a lump sum distribution was in fact illusory from an economic standpoint. If such evidence had been timely adduced in accordance with the case management orders of Magistrate Judge Shwartz, then Defendants might conceivably have been able to show that no real benefit was being cut. However, Defendants did not timely notice an intent to put on a Fed. R. Evid. R. 702 witness, nor did they adduce other evidence to prove such a point, nor did they argue such an inference during summation. Rather the entire thrust of the defense case relies on the semantic argument that the change was made to the Welfare Plan and not the Pension Plan.

18

The Court recognizes that in the context of a merger of local union chapters, there is a laudable desire by the management of the union to create equality of benefits for the union members.  The different funding levels of the pre-existing plans makes this a particularly difficult case to achieve that equality.  The former Local 675 Pension Plan was substantially underfunded, while maintaining a favorable lump sum benefit option, while former Local 102 Pension Plan was slightly overfunded with no lump sum benefit available.[7]  Nonetheless, the provisions of ERISA's anti-cutback rule do not permit a decrease in vested benefits as a method of equalizing benefits across the membership.  Benefits can be raised to reach equality, but this creates increasingly expensive benefits as locals are merged.  Indeed, Local 675 inherited the lump sum benefit from Local 262, and choice to achieve equality years ago by giving all Local 675 members that same benefit, thereby, at least partially, resulting in the underfunding of the Local 675 pension plan at the time of the merger with Local 102.

Given the trial record, the Court finds that an intent of the Disputed Amendment was to effect a change to the Local 102 Pension Plan via a constructive, indirect and/or de facto amendment prohibited by the anti-cutback rule.  The testimony related to the manner and purpose of the Disputed Amendment is compelling.  The witnesses were clear that a significant concern in enacting the Disputed Amendment to the Welfare Plan was to realize

---

[7] The animosity between the local chapters at the time of the merger was increased by the decision immediately prior to the merger by the former Local 675 Pension Plan to raise the rates for the monthly payout for vested benefits by approximately four percent.  This pre-merger increase in benefit levels increased the level of underfunding of the Local 675 Pension Plan by approximately $700,000 and created additional difficulties for the merger of the plans.  Nonetheless, there is no argument in this case that the decision to raise the monthly benefit levels prior to the merger was illegal or improperly executed.  Rather, Plaintiffs argue that the decision to increase the monthly benefit was an effort, without running afoul of the anti-cutback provision of ERISA, to discourage election of the lump sum option by making the monthly benefit more attractive.  (*See* Pl. Ex. P-9 and P-14.)

cost savings in the Pension Plan by discouraging Pension Plan participants from electing the lump sum option.

Defendants did not adduce proofs to support their claimed the reason for the Disputed Amendment. No document was put into evidence purporting to state the reason for the Disputed Amendment. Mr. Schell and Mr. Delle Cava testified that the Disputed Amendment to the Welfare Plan was enacted to reduce the burden on the Pension Plan, without testifying to any other strong reasons why the Disputed Amendment was in the best interest of the Welfare Plan. No financial impact studies were prepared at the time of the Disputed Amendment to demonstrate projected savings to the Welfare Plan. Therefore, it is fair to infer that Defendants' primary motivation for adopting the Disputed Amendment was to reduce the Pension Plan liabilities, and that the purported rationale – that the Disputed Amendment was enacted for the financial well-being of the Welfare Plan – is an after-the-fact rationale. Defendants did not raise the "financial hardship to the Welfare Plan" defense until after discovery had closed. Plaintiffs were permitted by Magistrate Judge Shwartz to take Mr. Delle Cava's deposition, at Defendants' expense, after the Final Pretrial Conference. Mr. Delle Cava was offered by Defendants as their witness knowledgeable regarding the defense. Plaintiffs called him at trial – where he gave testimony favorable to Plaintiffs.

While there may be some financial interest of the Welfare Plan served for those retirees who elect the lump sum and thereafter return to work, scant evidence was offered about the number of such instances and no attempt was made to tailor the Disputed

Amendment solely to the members who return to work after retiring.[8]   The weight of the evidence thus strongly tilts toward the inference that a major goal of the Disputed Amendment was to deter lump sum Pension Plan elections.   Although Defendants are entitled to amend the Welfare Plan, and even to discontinue all Welfare Plan benefits, Defendants are not permitted to use an amendment to the Welfare Plan to effectuate a cut-back to the vested lump-sum benefit in the Pension Plan.

### B.     Anti-Interference Under Section 510

Section 510 of ERISA, 29 U.S.C.A. § 1140, provides:

> "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any rights to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, . . ."

This provision operates ". . . primarily to protect the employment relationship that gives rise to an individual's pension rights." West v. Butler, 621 F2d. 240, 245 (6th Cir. 1980) (emphasis added), cited with approval in McGath v. Auto-Body North Shore, Inc., 7 F.3d 665, 667-69 (7th Cir. 1993).   There is no employer-employee relationship between any of Plaintiffs and any of the Defendants.   Plaintiffs argue that because the statute says "person" rather than "employer," the Court should permit Plaintiffs to maintain a Section 510 claim against the fiduciaries and trustees of the plans.

Nonetheless, Plaintiffs are unable to direct the Court to any case where a Section 510 claim has been upheld where there is no employer-employee relationship between the

---

[8] Nothing in this opinion limits the ability of the Local 102 Welfare Plan to amend eligibility rules to discontinue or limit benefits to participants who "retire" and elect Pension Plan benefits, but then return to work. Such an exercise of discretion might be permissible if the plan administrators demonstrate an appropriate basis for such restrictions.

parties.[9]  ERISA Section 510 was enacted by Congress primarily to prevent employers from discharging or harassing their employees in order to keep them from obtaining ERISA protected benefits. <u>Kowalski v. L & F Prods.</u>, 82 F.3d 1283, 1287 (3d Cir. 1996).  <u>See also Tolle v. Carroll Touch, Inc.</u>, 977 F.2d 1129, 1133 (7th Cir. 1992).   ERISA 510 claims are "limited to action affecting the employer-employee relationship, not mere changes in the level of benefits".  <u>Fischer v. Philadelphia Elec. Co.</u>, 96 F3d. 1533, 1543 (3d Cir. 1996). ERISA 510 "offers no protection against an employer's actions affecting the status or scope of an ERISA plan itself." <u>Deeming v. American Standard, Inc.</u>, 905 F2d. 1124, 1128 (7th Cir. 1990).

Therefore, the Court denies Plaintiff's Section 510 claim as improperly brought against these Defendants.

### C.    Plaintiffs' Breach of Contract and Estoppel Claims

Plaintiffs claim that the Disputed Amendment violated a basic principle of labor law, *i.e.*, that the Collective Bargaining Agreement and related documents carry with it an implicit promise that welfare benefits paid for by today's members, for the benefit of others, will not be cut off just when today's members become eligible; and certainly no such benefits should be cut off unless all union members bear the burden equally. <u>See</u> <u>United Steel Workers of Am. v. Warrior & Gulf Navigation Co.</u>, 363 U.S. 574, 578-80, 80 S. Ct. 1374 (1960) (describing "past practices" doctrine governing collective bargaining agreements).

---

[9] Plaintiffs' cases include many citations to cases involving an employer (or former employer)-employee relationship, but none of the cases stands for the expansion of Section 510 to plan beneficiaries and trustees of the plan.  <u>See</u> <u>Crouch v. Mo-Kan Iron Workers Welfare Fund</u>, 740 F.2d 805, 810 (U.S. App., 1984), <u>Gitlitz v. Compagnie National Air France</u>, 129 F.3d 554, 558 (U.S. App. 1997), <u>Blake v. Bank of New York</u>, 1992 WL 183632 (S.D. N.Y. 1992)

Plaintiffs concede, however, that there are no explicit written lifetime "guarantees" of their Welfare Plan benefits and that there is a "reservation of rights" clause in the Welfare Plan.  Instead, they argue that the Collective Bargaining Agreement ("CBE") "implicitly" promises that welfare benefits will be provided to Welfare Plan participants, since the CBE explicitly allocates funds to the Welfare Plan trust, rather than to salary or other benefits, and the Welfare Plan trust can neither use those funds for other benefits nor return them to the contractor-employers.

Moreover, Plaintiff's evidence has not shown that any contract that provided that existing benefits in both the IBEW Local 102 Pension Plan or IBEW Local 102 Welfare Plan upon merger of Local 675 with Local 102 would remain unchanged. (See D2, D12 and D33). Indeed, the Third Circuit has held that collective bargaining agreements do not state that retiree benefits, "will continue for the life of the retiree," or that they, "shall remain unalterable for the life of the retiree."   Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of Am. v. Skinner Engine Co., 188 F.3d 130, 138 (3d Cir. 1999).

Moreover, the Court does not infer a binding obligation to vest benefits absent some language in the Plan documents or the CBA that itself reasonably supports that interpretation. Joyce v. Curtiss-Wright Corp., 171 F.3d 130, 135 (2d Cir. 1999).  Employee welfare benefits are "extra-ERISA-commitments" and the vesting language "must be found in the plan documents and stated in clear and express language." In re Unisys Corp. Retiree Med. Ben. ERISA Litig., 58 F.3d 896, 902 (3d Cir. 1995).  Furthermore, the "plan participant bears the

burden of proving, by a preponderance of the evidence that the employer intended the welfare benefits to vest." Id.

Plaintiffs have not met their burden of proof to establish a contractual obligation to provide continued Welfare Benefits.  Furthermore, any federal common law contract claim raised by Plaintiffs is pre-empted by ERISA.  See Hughes Aircraft, 525 U.S. at 447 (because ERISA "is a comprehensive and reticulated statute and is enormously complex and detailed it should not be supplemented by extra-textual remedies, such as common-law doctrines.").

### D.    Plaintiffs' Fiduciary Duty Claim, ERISA Section 409, 29 U.S.C. § 1109

Section 409 of ERISA, 29 U.S.C. § 1109, provides: "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations or duties imposed upon fiduciaries by this subchapter shall be … subject to such other equitable or remedial relief as the court may deem appropriate …." See also 29 U.S.C. § 1104 (defining fiduciary duty standard).

Plaintiffs have alleged that Defendants – Local 102 Welfare Plan, Trustees in the Local 102 Welfare Plan and administrators of the Local 102 Welfare Plan, as fiduciaries – breached their fiduciary duty by approving the Disputed Amendment in order to benefit the Local 102 Pension Plan and the former Local 102 participants in the Local 102 Pension Plan to the detriment of the former Local 675 participants in the Local 102 Welfare Plan.  See Deak v. Masters, Mates and Pilots Pension Plan, 821 F.2d 572, 581 (11th Cir. 1987) ("absent any unfunded liability and actuarial determinations requiring restrictions on re-employment, discriminating among Plan beneficiaries to strengthen the Union was arbitrary and capricious and violated the Trustees fiduciary duty of loyalty."), cert. denied, 490 U.S. 1039, 109 S. Ct.

1943 (1988). <u>But cf.</u> <u>Walling v. Brady</u>, 125 F.3d 114 (3d Cir. 1997) (reversing district court that relied, in part, on <u>Deak</u>).

Plaintiffs have also alleged that Defendants violated their fiduciary duties by giving in to a conflict of interest, favoring the Local 102 Pension Plan and former Local 102 participants (who did not have a lump sum option), over former Local 675 participants (who did), even though both the anti-cutback rule and 29 U.S.C. § 1411 prohibit a reduction of benefits as the result of a merger.

Defendants respond that the Trustees of the Local 102 Welfare Plan did not act in a fiduciary capacity when the Disputed Amendment was adopted on April 19, 1999. "When an employer decides to establish, amend, or terminate a benefit plan, as opposed to managing any assets of the plan in accordance with its terms, its actions are not to be judged by fiduciary standards." <u>Fletcher v. Kroger Co.</u>, 942 F2d. 1137, 1139 (1991) (quoting <u>Musto v. American Gen. Corp.</u>, 861 F.2d 897, 913 (1988). See also D14, D15 and D16). The Supreme Court has repeatedly held that "employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify or terminate welfare plans." <u>Hughes Aircraft v. Jacobsen</u>, 525 U.S. 432, 443 (1999) (quoting <u>Curtiss-Wright Corp. v. Schoonejongen</u>, 514 U.S. 73, 78 (1995)). Furthermore, when employers undertake such action "they do not act as fiduciaries, but are analogous to the settlors of a trust." <u>Hughes Aircraft</u>, 525 U.S. at 443. (See also D14, D15 and D16). Thus, Defendants argue that when an employer (here, Defendant Trustees) makes decisions about the design of a welfare plan, it functions as an employer and not as an administrator, and thus, is not acting as a fiduciary. An employer can create a plan that furthers its business interests, and it can act according to

these interests in amending or terminating the plan.  <u>Noorily v. Thomas & Betts Corp.</u>, 128

F.3d 153, 168 (3d Cir. 1999). (See also D14, D15 and D16).

Because the Court finds that the Disputed Amendment violates the anti-cutback

provisions of ERISA, Plaintiffs will be entitled to elect a lump sum benefit in the Local 102

Pension Plan without jeopardizing their participation in the Local 102 Welfare Plan.  Thus,

there is no further equitable or remedial relief necessary for Plaintiffs to enjoy their rights

under the benefit plans.  For this reason, the Court finds that Plaintiffs' claim for breach of

fiduciary duty by the trustees is moot.

## IV.    CONCLUSION

For the reasons stated above, the Court finds that because the Disputed Amendment

to the Welfare Plan is tied to an election in the Pension Plan, it is an indirect amendment to

the Pension Plan which has the effect of reducing Plaintiffs' vested accrued right to make a

lump sum election in the Pension Plan.  This amendment violates the anti-cutback provisions

of ERISA, Section 204(g)(1), 29 U.S.C. § 1054(g)(1).   An appropriate Order shall issue.


**/s/ Faith S. Hochberg**
Hon. Faith S. Hochberg, U.S.D.J.

26